UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE E. ALLEN, | ) | CASE NO. 1:17CV2088 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Jacqueline E. Allen ("Plaintiff"), requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In her brief on the merits filed on January 10, 2018m Plaintiff asserts that the Appeals Council violated her due process and equal protection rights when it denied her July 10, 2017 and August 10, 2017 requests for time extensions without notice or explanation. ECF Dkt. #16 at 1-2. She also contends that the administrative law judge ("ALJ") committed errors by: (1) incorrectly stating her onset of disability date; (2) failing to apply Social Security Ruling 12-2p to her fibromyalgia condition and failing to consider the objective medical evidence supporting the intensity, severity, persistence, and limiting effects of her conditions; (3) determining that Plaintiff could perform light work and her past relevant work; and (4) finding that her skills were transferable to other job classifications. *Id.* at 1-23. On February 8, 2018, Defendant filed a brief on the merits. ECF Dkt. #18. Plaintiff filed a reply brief on February 22, 2018. ECF Dkt. #19.

For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety with prejudice.

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

## I.      FACTUAL AND PROCEDURAL HISTORY

In December of 2013 and January of 2014, Plaintiff filed applications for DIB and SSI, respectively, alleging disability beginning September 8, 2010 due to fibromyalgia, hypothyroidism, plantar fasciitis memory problems, migraines, glaucoma, depression, asthma, back pain, and neck pain. ECF Dkt. #14 ("Tr.") at 243-257, 280.[2]  Plaintiff's applications were denied initially and upon reconsideration.  *Id.* at 141-142, 169-170, 173-203.  Following the denial of her applications, Plaintiff requested an administrative hearing, and on January 29, 2016, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE").  *Id.* at 59, 204.  On February 25, 2016, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI.  *Id*. at 40-54.

On April 4, 2016, Plaintiff's counsel advised Plaintiff that she would not be pursuing Plaintiff's claim to the Appeals Council and she was withdrawing from her case.  Tr. at 35.  Counsel informed Plaintiff of her time limitation in which to file an appeal.  *Id.*

On April 27, 2016, Plaintiff, through new counsel, requested that the Appeals Council grant her a 60-day extension in order to submit her request for review of the ALJ's hearing decision because of her former counsel's withdrawal and new counsel's representation.  Tr. at 240.

On June 17, 2016, Plaintiff, through counsel, noted that she had timely filed Plaintiff's request for review and counsel had filed her appointment of representative form as well.  Tr. at 317. Plaintiff's counsel further indicated that she not yet received her User ID and Rep ID and Plaintiff was undergoing chemotherapy after having a bilateral mastectomy on April 20, 2016.  *Id*.  Counsel indicated that Plaintiff had insufficient time to secure and prepare the necessary documentation for Appeals Council review and she requested an additional 60 days in which to provide said documentation.  *Id*.  On July 5, 2016, the Appeals Council granted the extension and indicated that Plaintiff must send the necessary information within 25 days of the date of the letter.  *Id*. at 33.  The

---

[2]All citations to the transcript refer to the page numbers assigned when the transcript was filed in the CM/ECF system rather than the page numbers assigned when the transcript was compiled.  This allows the Court and the parties to easily reference the transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECF system.

letter also explained that the Appeals Council would not allow more time to send information except for very good reasons. *Id*.

On July 22, 2016, Plaintiff, through counsel, wrote a letter to the Appeals Council noting that she had timely filed Plaintiff's request for review and counsel had filed her appointment of representative form as well. Tr. at 320. Plaintiff's counsel indicated that she had not yet received her User ID and Rep ID. *Id.* Plaintiff's counsel further indicated that Plaintiff had been undergoing chemotherapy after her bilateral mastectomy on April 20, 2016 and had been unable to help assist counsel in gathering information and documentation to submit to the Appeals Council. *Id.* They requested an additional 60 days in which to provide said documentation. *Id*.

On September 23, 2016, Plaintiff, through counsel, wrote a letter to the Appeals Council noting that she had timely filed Plaintiff's request for review and counsel had filed her appointment of representative form as well. Tr. at 324. Plaintiff's counsel further indicated that the Appeals Council had received her June 17, 2016, and July 22, 2016 letters requesting additional time in which to provide additional information. *Id.* Counsel explained that she had received her User ID and Rep ID, but she was unable to complete the process because the Appeals Council had the file. *Id.* Counsel indicated that Plaintiff had been undergoing chemotherapy for several weeks and had been unable to help assist counsel in gathering information and documentation to submit to the Appeals Council. *Id.* They requested an additional 60 days in which to provide said documentation. *Id*.

On November 28, 2016, Plaintiff, through counsel, wrote a letter to the Appeals Council again noting that she had timely filed Plaintiff's request for review and counsel had filed her appointment of representative form as well. Tr. at 328. Plaintiff's counsel further indicated that the Appeals Council had received her June 17, 2016, July 22, 2016, and September 23, 2016 letters requesting more time in which to provide it with additional information. *Id.* Counsel explained that she had received her User and Rep IDs, but she was unable to complete the process for ARS because the Appeals Council had the file. *Id.* Plaintiff's counsel indicated that Plaintiff had been undergoing chemotherapy for several weeks and had been unable to help assist counsel in gathering information

and documentation to submit to the Appeals Council.  *Id*.  They requested an additional 60 days in which to provide said documentation.  *Id*.

On January 26, 2017, Plaintiff, through new counsel, wrote a letter to the Appeals Council noting that she had timely filed Plaintiff's request for review and counsel had filed her appointment of representative form as well.  Tr. at 331.  Plaintiff's counsel further indicated that the Appeals Council had received her June 17, 2016, July 22, 2016, and September 23, 2016 letters requesting additional time to provide additional information.  *Id*.  Counsel explained that she had received her User ID and Rep ID, but she was unable to complete the process for ARS because the Appeals Council had the file.  *Id*.  Plaintiff's counsel indicated that Plaintiff had been undergoing chemotherapy for several weeks and had been unable to help assist counsel in gathering information and documentation to submit to the Appeals Council.  *Id*.  They requested an additional 60 days in which to provide said documentation.  *Id*.

On February 24, 2017, the Appeals Council granted Plaintiff additional time within which to file her request for review.  Tr. at 21.  The Appeals Council indicated that Plaintiff had to send any additional evidence or statements within 25 days of the date of its letter.  *Id*.

On March 30, 2017, Plaintiff, through counsel, acknowledged receipt of the Appeals Council's February 24, 2017 letter granting additional time to file the request for review, but Plaintiff requested an additional 60 days in which to file appeal materials.  Tr. at 334.  Plaintiff's counsel again explained that she had received her User and Rep IDs, but she was unable to complete the process because the file was in the Appeals Council's office.  *Id*.  Plaintiff's counsel also again indicated that Plaintiff was continuing to undergo chemotherapy and had been unable to assist her in gathering information and documentation to submit to the Appeals Council.  *Id*.  On April 10, 2017, the Appeals Council granted Plaintiff additional time within which to file her request for review.  *Id*. at 19.  The Appeals Council indicated that Plaintiff had to send any additional evidence or statements within 25 days of the date of its letter.  *Id*.

On May 5, 2017, Plaintiff, through counsel, acknowledged receipt of the Appeals Council's granting of her request for an extension of time and requested another 60 days within which to submit appeal materials.  Tr. at 340.

-4-

On May 19, 2017, Plaintiff, through counsel, submitted a clinical summary for Plaintiff and her diagnosis of breast cancer.  Tr. at 24.  Plaintiff requested that the Appeals Council consider that and Plaintiff's chemotherapy treatment and another surgery through June 2017 in conjunction with their request for additional time within which to respond to the ALJ's decision.  *Id.*  On May 19, 2017, the Appeals Council sent a letter to Plaintiff's counsel granting an extension of time and enclosing a CD of exhibits and recordings in Plaintiff's case.  *Id*. at 14.  On May 22, 2017, the Appeals Council sent a letter indicating that it had again granted Plaintiff's request for an extension of time and indicated that Plaintiff had to send any evidence or statement within 30 days of the date of the letter.  *Id*. at 11.

On June 12, 2017, Plaintiff, through counsel, sent a letter to the Appeals Council indicating that her counsel had not had sufficient time to review a CD which had Plaintiff's record on it.  Tr. at 343.  Plaintiff indicated that she continued to undergo chemotherapy until the end of June of 2017 and her surgery was rescheduled until August of 2017.  *Id*.  She requested additional time in which to respond to her request to review the ALJ's decision.  *Id*.  On June 14, 2017, the Appeals Council granted Plaintiff's request for an extension of time and indicated that Plaintiff had to send any evidence or statement within 25 days of the date of the letter.  *Id*. at 9.

On July 31, 2017, the Appeals Council denied Plaintiff's request for review.  Tr. at 1.  The Appeals Council indicated that it had reviewed the medical evidence that Plaintiff submitted in her request for review and found that some of it was not new as it was a duplicate of evidence already in the record, and the rest was not related to the time period at issue in the case, so it did not affect the ALJ's decision.  *Id.* at 2.

On October 4, 2017, Plaintiff filed a complaint in this Court appealing the determination as to the denial of her social security benefits and alleging due process and equal protection violations by the Appeals Council in failing to consider her good cause reasons for granting her extensions of time dated July 10, 2017 and August 10, 2017.  ECF Dkt. #1.  On October 5, 2017, this case was referred to the undersigned for a Report and Recommendation.

On January 10, 2018, Plaintiff filed a brief on the merits. ECF Dkt. #16. On February 8, 2018, Defendant filed her brief on the merits. ECF Dkt. #18. On February 22, 2018, Plaintiff filed her reply brief. ECF Dkt. #19.

## II. RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A. MEDICAL EVIDENCE

The undersigned reviews only the medical evidence of Plaintiff's physical conditions since her allegations of error are limited to such conditions.

The medical evidence of record shows that Plaintiff received treatment and physical therapy for plantar fasciitis dating back to 2008. Tr. at 347-357.

On January 14, 2010, Plaintiff presented to Dr. Faiman, an endocrinologist, for follow up of her hypothyroidism. Tr. at 371. He noted that she was last seen on October 7, 2008 and was taking Synthroid, Cytomel, and Prozac. *Id.* Plaintiff reported no symptoms of hypothyroidism or hyperthyroidism. *Id.* Upon examination, Dr. Faiman found that Plaintiff's thyroid gland was diffusely enlarged, left greater than right, and its overall size was unchanged at 40 grams. *Id.* The rest of the examination yielded normal results. *Id.* He diagnosed Plaintiff with Hashimoto's hypothyroidism, hyperlipidemia, degenerative joint disease ("DJD"), and gastroesophageal reflux disease ("GERD"). He ordered a TSH level test and discussed the nonspecificity of Plaintiff's symptoms. *Id.*

On January 18, 2012, Plaintiff presented to Dr. Mackey Sawyer for right upper quadrant pain, hypothyroidism, hyperlipidemia, and depression over the deaths of her mom, sister and cousin over the last year. Tr. at 401-402. Dr. Mackey Sawyer's physical examination showed that Plaintiff was in no acute distress, her thyroid was symmetric and normal-sized, and she had otherwise normal examination findings, except for right upper quadrant tenderness, with no rebound, guarding, or masses. *Id.* Dr. Mackey Sawyer diagnosed Plaintiff with right upper quadrant pain and wanted to rule out cholelithiasis, so she ordered blood testing. *Id.* at 403. She also wanted Plaintiff to undergo a colonoscopy. *Id.* at 400. Past labs showed that Plaintiff's TSH was normal on January 19, 2012, but her cholesterol, LDLs, and basophils were high. *Id.* at 414-417, 539-545. A sonogram of the right upper quadrant showed normal liver, gallbladder, pancreas and right kidney. *Id.* at 433, 562.

-6-

February 12, 2012 Cleveland Eye Clinic notes show that Plaintiff met with Dr. Bafna for a glaucoma evaluation.  Tr. at 509.  It was noted that Plaintiff's optic pressures had been rising over the years.  *Id.*  Dr. Bafna diagnosed Plaintiff with primary, open angle, early mild stage glaucoma and he prescribed Travatan eye drops.  *Id.* at 511.  Notes from the Cleveland Eye Clinic dated March 21, 2012 show that Plaintiff followed up with Dr. Bafna for her glaucoma.  *Id*. at 507.  Dr. Bafna found that Plaintiff's eye pressure was much better with Xalatan.  *Id.*

An April 23, 2012 mammogram showed normal results.  Tr. at 432, 563-564.

July 23, 2012  Cleveland Eye Clinic notes show that Plaintiff followed up with Dr. Bafna for her glaucoma.  Tr. at 502.  Plaintiff indicated that she had no change in her vision and no discomfort, and she continued to use the Travatan drops as directed.  *Id.*  Dr. Bafna found that Plaintiff should continue with the Travatan drops for her primary, open angle, mild stage glaucoma. *Id.* at 504.

On September 5, 2012, Plaintiff presented to Dr. Mackey Sawyer for pain all over her body, including her feet, arms and legs.  Tr. at 398.  Plaintiff indicated that she was diagnosed with fibromyalgia in the past and she had intense pain for the last 10 days.  *Id*.  She explained that she was getting poor sleep, but her mood was stable, and she had been a caregiver to her cousin, mom and sister over the past 8 months and they all died of breast cancer.  *Id*.  Plaintiff indicated that a migraine had started two days prior and it improved, but then she had muscle cramping, arm, leg and back pain, and she had taken Prozac for fibromyalgia in the past.  *Id*. Dr. Mackey Sawyer's physical examination showed that Plaintiff was in no acute distress, her thyroid was symmetric and normal-sized, but she had tender points in her bilateral occipital area, bilateral scapula, bilateral sternoclavicular area, bilateral shoulders, bilateral hips and in her upper buttocks.  *Id*.  Plaintiff had normal extremities and gait, with normal reflexes and intact sensation.  *Id*.  Dr. Mackey Sawyer diagnosed Plaintiff with fibromyalgia, prescribed Lyrica and ordered tests, and she diagnosed Plaintiff with anxiety, hyperlipidemia and hypothyroidism, she continued Plaintiff's medications, and she ordered blood tests  *Id*.  at 400.  September 12, 2012 lab results show high cholesterol and LDLs, a low TSH level, and a slightly high sedimentation rate.  *Id*. at 411-412, 546-548.

Cleveland Eye Clinic notes dated November 19, 2012 show that Plaintiff followed up with Dr. Bafna for her glaucoma.  Tr. at 499.  Plaintiff complained that she was having a hard time focusing her eyes at distances between 3-8 feet.  *Id.*  She also complained of a few floaters in both eyes but no flashes, and she was using Travatan for her glaucoma as directed.  *Id.*  Dr. Bafna found that Plaintiff should continue with the Travatan drops.  *Id.* at 500.

On March 1, 2013, Plaintiff presented to Dr. Mackey Sawyer for migraines over the past three days.  Tr. at 393.  She reported that she had a history of migraines and had her first one at 22 years old.  *Id.*  She used to have 1-2 migraines per year until October, when she began having 2-3 per month.  *Id.*  Plaintiff described her migraines and explained that prior to October, she would usually take aspirin every four hours and the migraine would stop.  *Id.* at 393-394.  She also reported that when her fibromyalgia flared, her migraines also flared.  *Id.* at 394.  Plaintiff also needed a medication refill for her GERD.  *Id.*  The physical examination showed normal results, except for a diffusely enlarged thyroid.  *Id.* at 395.  Dr. Mackey Sawyer diagnosed Plaintiff with a migraine, gave her an injection of Toradol, and gave her samples and prescriptions for Relpax and Phenergan.  *Id.*  She also diagnosed Plaintiff with hypothryoidism, an enlarged thyroid, GERD, hyperlipidemia and she ordered blood tests and refilled Plaintiff's medications.  *Id.* at 395-396.

Lab tests dated March 11, 2013 and March 12, 2013 show abnormal T3 and lipid panel results.  Tr. at 372-373, 410-411, 548-550.

March 18, 2013 Cleveland Eye Clinic notes show that Plaintiff followed up with Dr. Bafna for glaucoma.  Tr. at 495.  She complained of difficulty viewing TV, and reading closed captions and news scrolls with her left eye, which gradually began four months prior.  *Id.* She also complained of 2-4 migraines since October of 2012 with sound, smell and light sensitivity on the left side up to three days at a pain level of 10.  *Id.*  Dr. Bafna found that Plaintiff's eye pressure was stable and he changed Plaintiff's Latanoprost drops due to insurance concerns.  *Id.* at 496.

On March 18, 2013, a thyroid scan showed a large multi-nodular thyroid.  Tr. at 430, 565.

Cleveland Eye Clinic notes dated April 15, 2013 show that Plaintiff followed up with Dr. Bafna for glaucoma.  Tr. at 490.  Plaintiff complained that her eyelids felt like sandpaper and were

itchy and shedding since she began taking Latanoprost eye drops. *Id.* at 491. Dr. Bafna found that Plaintiff's eye pressure was stable and he changed Plaintiff's medication to Lumigan. *Id.* at 492.

On April 20, 2013, Plaintiff presented to the emergency room indicating that she tripped over her feet and her dog and hit her right ribs on the bed. Tr. at 577. Physical examination showed normal results. *Id.* at 579. Chest and rib x-rays showed normal results. *Id.* at 428, 566, 579. She was diagnosed with a fall and rib contusion and discharged with pain medications. *Id.*

On June 5, 2013, Plaintiff presented to Dr. Faiman, who noted that he saw Plaintiff in 2010 for hypothyroidism with a goiter and they tried a combination of medications but they were ineffective. Tr. at 367. Plaintiff stated that she was on Levoythyroxine, but thyroid felt larger and she had difficulty breathing and swallowing. *Id.* He also noted her symptoms of fatigue, cold intolerance, dry skin and hair, and decreased concentration, focus and mood. *Id.* He reviewed ultrasound results showing a large multinodular thyroid with no mention of a dominant nodule or any concerning features. *Id.* Dr. Faiman noted Plaintiff's past medical history as including fibromyalgia and glacoma, as well as hyperlipidemia, GERD and edema. *Id.* Upon examination, Dr. Faiman found that Plaintiff was 5 feet, 4 inches tall and weighed 215 pounds. *Id.* He noted no neurological deficits, no adenopathy, but a diffusely enlarged thyroid, left greater than right, which was bigger than at her previous exam. *Id.* He diagnosed Plaintiff with Hashimoto's hypothyroidism, hyperlipidemia, GERD, DJD, peripheral edema, and fibromyalgia. *Id.* Dr. Faiman discussed Plaintiff's nonspecific thyroid symptoms and indicated that while Plaintiff's thyroid levels were appropriate, indications for surgery existed as her thyroid gland had increased in size and she was having obstructive symptoms. *Id.* at 367-368. He gave Plaintiff the names of surgeons and noted that he did not believe that there was a thyroid component to her fibromyalgia. *Id.* at 368.

On July 19, 2013, Plaintiff presented to the emergency room complaining of a rash on her left hip down to her knee with painful lesions which started the day before. Tr. at 580. She was diagnosed with a shingles outbreak and given medication. *I*d. at 582.

On August 1, 2013, Plaintiff underwent a total thyroidectomy for a chronic lymphocytic thyroiditis and thyroid goiter and she was discharged from the hospital on August 3, 2013. Tr. at 378-383, 471.

December 20, 2013 Cleveland Eye Clinic notes show that Plaintiff presented to Dr. Chester from the emergency room due to her eyelids feeling like they were burning for the past 8 months. Tr. at 487.  Plaintiff complained of a moderate stabbing pain with redness, irritation, bleeding and cracking. *Id.* Dr. Chester noted Plaintiff's history of primary, open angle, mild stage glaucoma.  *Id.* He found that Plaintiff's eye pressure was stable and he told her to continue with Lumigan drops for the condition.  *Id.* at 488.  He also added medication for her contact dermatitis of the eyelids.  *Id.*

Lab test results dated January 14, 2014 showed normal results, except for high cholesterol and LDLs and low T3 levels.  Tr. at 408-409, 550-554.

Notes from the Cleveland Eye Clinic dated January 16, 2014 show that Plaintiff followed up with Dr. Chester for dermatitis of both eyes and glaucoma.  Tr. at 478.  Plaintiff complained of continued burning eyelids that were itchy, cracked and dry.  *Id.* at 479.  Dr. Chester noted Plaintiff's history of primary, open angle, mild stage glaucoma and contact dermatitis on her eyelids.  *Id.* He found that Plaintiff's eye pressure was stable and he added medication for her contact dermatitis. *Id.* at 484.  Dr. Chester indicated that no treatment was necessary for Plaintiff's cataract, but continued observation was necessary.  *Id.*

On January 22, 2014, Plaintiff presented to Dr. Mackey Sawyer for complaints of headaches and review of lab results.  Tr. at 388-392.  Plaintiff's status post thyroidectomy was noted and her care with Dr. Faiman for chronic lymphocytic thyroiditis.  *Id.* at 388.  Her TSH level was normal and she was doing well on her current dose of Synthroid.  *Id*.  Dr. Mackey Sawyer assessed Plaintiff's lipidemia and noted that blood test results showed high cholesterol and LDLs, but lower triglyceride from her March 11, 2013 test results.  *Id*. at 388-389.  In discussing her anxiety, Plaintiff reported that it was stable on her dosage of Prozac.  *Id*. at 389.  When discussing her fibromyalgia, Plaintiff stated that she had daily pain and she was unable to tolerate Cymbalta and Lyrica, and she was taking Naprosyn over the counter daily.  *Id*. Plaintiff told Dr. Mackey Sawyer that she was applying for disability due to pain and foggy thinking and she was unable to work as a respiratory therapist.  *Id.* Plaintiff also complained that her migraines had recently flared and had increased in intensity and frequency since October of 2013, even though she had migraines since she was 22 years old.  *Id.* She reported that she used to have migraines 2-3 times per year, but since October

of 2013, she was having up to three per week. *Id*. She ran out of Imitrex a month prior. *Id*. She described having fuzzy vision and a positive aura, then a headache on the left side that would throb, and she would have nausea, vomiting, and photophobia. *Id*. She was wearing sunglasses at her visit. *Id*. Plaintiff also indicated that she had recently been diagnosed with glaucoma. *Id.* Plaintiff's physical examination was normal. *Id*. at 390. Dr. Mackey Sawyer diagnosed Plaintiff with, among other conditions, a headache with a history of worsening migraines with aura, and she prescribed Topomax and ordered a brain CT scan. *Id*. She also diagnosed Plaintiff as hypothyroid and continued her Synthroid. *Id*. She also diagnosed Plaintiff with stable anxiety and hyperlipidemia and she began her on Lipitor. *Id.* at 390-391.

A January 22, 2014, mammogram showed scattered fibroglandular densities and a questionable new nodular density at the superior aspect of the right breast. Tr. at 425, 469. Further evaluation was recommended. *Id*. The brain CT scan showed normal results. *Id*. at 427, 567.

A February 2, 2014 mammogram showed normal results. Tr. at 420. A February 4, 2014 bone density scan showed low bone mass/osteopenia by the hip and spine. *Id*. at 422, 570. A February 12, 2014 brain CT scan showed normal results. *Id*. at 575.

On February 12, 2014, Plaintiff presented to the emergency room complaining of headaches after she fell 17 days ago on the ice and hit her head. Tr. at 583. Physical examination and a CT of the brain showed normal results and she was diagnosed with a concussion. *Id*. at 585.

On February 21, 2014, Plaintiff presented to Dr. Mackey Sawyer for follow up on her concussion. Tr. at 519. Dr. Mackey Sawyer noted that on January 26, 2014, Plaintiff fell on the ice when she was shoveling the driveway, hitting the back of her head, with a loss of consciousness, but a February 12, 2014 brain CT showed normal results. *Id.* at 519-520. Plaintiff indicated that her symptoms were slowly improving, but she had occipital headaches and neck pain, as well as tinnitus, fatigue, lightheadedness, reduced memory and concentration, and she was off balance with stairs. *Id*. at 520. Plaintiff stated that she was able to work 3 days a week with her pottery. *Id.* She also reported amnesia as to events prior to the fall. *Id*. As to her complaints of parathesias of her hands and feet, Dr. Mackey Sawyer noted that this could be from Plaintiff taking Topamax for her migraines. *Id.* Plaintiff reported that her migraines were better on Topamax and her headaches from

-11-

the fall had improved.  *Id*.  Dr. Mackey Sawyer's physical examination of Plaintiff showed all normal results.  *Id.* at 521.  She diagnosed Plaintiff with concussion syndrome and cervical spine pain and ordered cervical spine x-rays.  *Id.* at 522.  The cervical spine x-rays showed no fractures, but degenerative changes with mild disc space narrowing at C5-C6 and C6-C7 with mild spurring, and moderate right-sided bony foraminal narrowing at C3-C4, C4-C5, and C5-C6.  *Id.* at 532, 576.

Records show that on April 1, 2014, Plaintiff sought treatment at Brecksville Physical Medicine and she received chiropractic treatment, with occipital nerve blocks and injections in her back, hips and left wrist.  Tr. at 587-777.  She identified her chief complaint as cervical and thoracic spine pain and migraines.  *Id.* at 590.  Plaintiff explained that these conditions had been problematic for over 30 years and they were severe.  *Id.*  She also identified severe pain from bilateral plantar fasciitis that she had for about 8 years.  *Id.*  Physical examination showed that Plaintiff's skin, heart, lungs, and neurological systems were within normal limits. *Id.* at 591.  She had weakened pulses in her extremities, but normal strength.  *Id.* at 592. Examinations throughout Plaintiff's treatment showed from 4 to 24 trigger points.  *Id.* at 693, 654, 668, 686, 697, 717, 734.  She was diagnosed with myalgia and myositis, spinal enthesopathy, unspecified musculoskeletal disorder in the cervical spine, enthesopathy of the hip region, bursae disorders, brachial neuritis and radiculitis, thoracic, lumbar and cervical degeneration, muscle spasms, lumboalgia, cervicocranial syndrome, headache, abnormal posture, plantar fasciitis, sacroiliac, pelvis, hip, and thigh pain, sacroilitis, lumbago, and cervical, thoracic, and lumbar segmental dysfunction, *Id.* at 596-600.

On April 9, 2014, Plaintiff presented to Dr. Mackey Sawyer for a gynecologic exam and follow-up from her concussion.  Tr. at 514.  Dr. Mackey Sawyer noted that Plaintiff was status- post a fall on the ice form January 26, 2014 with a loss of consciousness and normal brain CT scan.  *Id.* Plaintiff stated that her symptoms were slowly improving and her headaches were not as frequent, although she still had tinnitus, lack of energy, and lightheadedness/vertigo when she changed positions.  *Id.*  Plaintiff stated that her memory and concentration were coming back, and she was working with a chiropractor.  *Id.*  She reported fibromyalgia flares, but she had returned to work for 4 hours at a time.  *Id.*  She also informed Dr. Mackey Sawyer that Topamax was helping "tremendously" with her migraines and her mood was stable.  *Id.* Plaintiff also reported doing well

on Lipitor. *Id*. Labs were ordered. *Id*. Dr. Mackey Sawyer's physical examination found all normal results, except Plaintiff's BMI was above average as she was 5 feet, 3 inches tall and weighed 192 pounds. *Id*. at 516.

Lab tests dated April 9, 2014 showed normal results. Tr. at 530-531, 555-556.

On May 15, 2014, x-rays of Plaintiff's lumbar spine showed small anterior and lateral osteophytes at several levels and a grade I L4-L5 spondylolisthesis. Tr. at 449. The doctor's impressions were lumbar spine degenerative changes and Grade I L4-L5 spondylolisthesis. *Id*. at 450 Cervical x-rays showed degenerative changes as well, with disc space narrowing at C5-C6 and C6-C7, with anterior and posterior osteophytes, and mild foraminal narrowing at those levels. *Id*.

On May 15, 2014, Plaintiff underwent an agency medical examination by Dr. Darr. Tr. at 453-457. He noted that Plaintiff's disability claims due to low back pain, fibromyalgia, migraines, tinnitus, and vertigo. *Id*. at 453. Plaintiff indicated that she was in a car accident over 40 years ago and since then, she had low back pain and was receiving physical therapy 3 times per week. *Id*. She noted her fibromyalgia diagnosis and complained of pain in the back of her neck and shoulders, her lower back, and in her leg. *Id*. Plaintiff explained that she suffered a concussion in January of 2014 and passed out and CT scans showed no cranial bleed, but she had compression, tinnitus and vertigo. *Id*. She further stated that prior to the concussion, she started having migraines and she was on medication, but she still suffers from them twice per week on the left side of her head with nausea, and they last for several hours. *Id*.

Upon examination, Dr. Darr found that Plaintiff had normal visual fields, a normal gait, low back pain with prolonged sitting and standing, normal hearing and intelligence, and good recent and remote memory. Tr. at 455. He found no redness, warmth or swelling in the upper extremities, and no tenderness in the shoulders, elbows, hands or lower extremities. *Id.* at 456. He found no hip joint tenderness, redness, warmth or swelling, and normal muscle strength, no atrophy, intact sensation, and ability to walk on the heels and toes and to perform tandem gait without difficulty. *Id.* He noted that squatting caused aggravation of Plaintiff's low back pain, and she claimed pain in the back of her shoulders, in her legs, and some radiation of back pain into her legs. *Id*. Dr. Darr found that Plaintiff had a "normal physical examination," and he diagnosed history of fibromyalgia, history of

-13-

tinnitus and vertigo, status post concussion, and history of low back pain, probably degenerative disc disease ("DDD.").  Dr. Darr opined that Plaintiff could lift and carry 30-40 pounds frequently and over 40-60 pounds occasionally.  *Id.* at 457.

May 15, 2014 notes from the Cleveland Eye Clinic show that Plaintiff presented for her glaucoma check and she complained that her vision seemed to come and go, especially in the morning.  Tr. at 474.  She also reported that her eyes were itchy, dry, and irritated and she was compliant with prescribed eye drops.  *Id.*  Plaintiff indicated that ever since her January 2014 concussion, she had a hard time looking at the computer or any type of screen and she gets dizzy and nauseous.  *Id.*  Dr. Chester opined that Plaintiff had primary, open angle, mild stage glaucoma and stable eye pressure upon his examination.  *Id.* at 476. He also diagnosed cataracts and found that no treatment was necessary at the time but continued observation was necessary.  *Id.*

February 6, 2015 blood test results showed a high TSH level, slightly high basophil levels, low protein, glom filtration rates, and low Viamin D and low non-HDL cholesterol levels.  Tr. at 526-530, 557-561.  May 18, 2015 blood test results showed that Plaintiff had a normal TSH, but low Vitamin D levels.  *Id.* at 525, 561.

On January 22, 2016, Plaintiff underwent a right breast biopsy and the results showed that she had a carcinoma of the right breast.  Tr. at 788.

## B.     TESTIMONIAL EVIDENCE

On January 29, 2016, the ALJ held a hearing in which Plaintiff, represented by counsel, testified.  Tr. at 59.  A VE also testified.  *Id.*  Counsel for Plaintiff presented an opening statement and indicated that Plaintiff had just been diagnosed with right breast cancer the day before the hearing and there were no current plans for treatment since the diagnosis was so recent.  *Id.* at 63. Counsel also advised that no mental health conditions were being alleged in this case.  *Id.* at 64.

Plaintiff testified that she was 58 years old and lived in a one-floor house with her adult son, 2 dogs and 2 cats.  Tr. at 65.  She had a college degree and had attended school to become a paramedic, a respiratory therapist, and a sleep technologist.  *Id.* at 65-66. She reported that she could drive, but she avoided doing so because she could not see well at night.  *Id.* at 66.  She weighed 180 pounds and was 5'3" tall, and she had gained 40 pounds over the past year due to having her thyroid

-14-

removed and her inactivity because she could not ride horses like she used to, or ride a bike or walk. *Id.* at 67-68.  She used to volunteer teaching art to home-schooled children in 2014, she taught knitting in 2013, and she knits scarves for breast cancer survivors and blankets for the hospitals. *Id.* at 72-73.  She taught pottery classes in 2011 and 2012 and last taught art in 2014-2015. *Id.* at 74.

Plaintiff explained that she could not perform full-time work anymore because she "hurt." Tr. at 88.  She indicated that she cannot look at a computer anymore because she develops migraine headaches within 3-5 minutes. *Id.*  This includes looking at a cell phone, watching television, or going to a movie. *Id.* at 88-89.  She also has trouble with her eyesight, but she was not sure if it was because of the migraines or glaucoma. *Id.* at 88, 91.  She has migraines everyday and she takes medication for them, which makes her fall asleep immediately. *Id.* at 93.  She reported that she always has back and neck pain and her fibromyalgia causes her constant pain, including neck, back, knee and elbow pain, especially in the winter months. *Id.* at 91. She cannot walk due to pinched nerves going down her right leg which always hurts. *Id.* at 90-91.  Her feet hurt due to plantar fasciitis. *Id.* at 90. Plaintiff explained that she receives chiropractic treatment 2 to 3 times per week, she gets injections and massages, she exercises and soaks in the bathtub, she takes aspirin 3 times per day, and she wears gloves and knits to help her hands and wrists. *Id.* at 95-96, 99.

Plaintiff stated that she can stand at the sink and wash dishes for 5 minutes before she has to sit down, she can walk without a cane for about 30 feet, but she mainly uses her sister's cane and sometimes a walker inside of her house.  Tr. at 97-98.  She cannot lift her 4-pound dog and every so often she lifts a gallon of milk. *Id.* at 98.  She also indicated that she has carpal tunnel syndrome that was diagnosed a year and a half ago, although she had been having trouble with her hands since 2005. *Id.* She does not cook or shop because her son is a chef and he does it and her son does the laundry. *Id.* at 99.  She goes to visit friends every Tuesday and Thursday and they knit and she sometimes does small loads of laundry at her friend's house because the machines are not downstairs. *Id.*  She has a lawn service cut her grass, she visits with her siblings, and she checks in on her father who lives up the street. *Id.* at 101.  She makes sure that he has proper food in the house and that he remembers his doctor appointments. *Id.*

Plaintiff discussed her breast cancer diagnosis and explained that she was going to the doctor in the next week to find out more details.  Tr. at 102.

The ALJ then questioned the VE, who characterized Plaintiff's past work.  Tr. at 107.  The ALJ asked him to assume a hypothetical individual with Plaintiff's age, education, and work experience, with the ability to lift and carry up to 50 pounds occasionally, 25 pounds frequently, and she could sit, stand/walk up to 6 hours per 8-hour workday, never climb ladders, ropes or scaffolds, frequently stoop and crouch, and never be exposed to hazards, especially unprotected heights.  *Id.* at 107-108.  The VE indicated that such a hypothetical individual could perform Plaintiff's past work as a respiratory therapist and a pulmonary function technician, and she could perform other jobs existing in significant numbers in the national and regional economies, such as dietary aide, assembler, and cleaner.  *Id.* at 108-109.

The ALJ asked the VE to assume a hypothetical individual with Plaintiff's age, education, and work experience, with the ability to lift and carry up to 20 pounds occasionally, 10 pounds frequently, she could sit for up to 6 hours per 8-hour workday, stand/walk for up to 4 hours per 8-hour workday, frequently operate right foot controls, never climb ladders, ropes or scaffolds, never be exposed to hazards, and she could frequently stoop and crouch.  *Id.* at 109.  The VE responded that the hypothetical individual could not perform Plaintiff's past work as a respiratory therapist, but she could perform Plaintiff's past work as a pulmonary function technician and could perform other jobs existing in significant numbers in the national and regional economies, such as ticket taker, mail sorter, and office helper.  *Id.* at 110.

Plaintiff's counsel asked that the VE modify the ALJ's second hypothetical individual to the ability to occasionally lift up to 10 pounds and frequently lift less than 10 pounds, and the ability to stand and walk for 2 hours out of an 8-hour workday.  Tr. at 110.  The VE responded that no work would be available because it is less than sedentary level work and less than full-time work.  *Id.* at 111. Plaintiff's counsel asked the VE to add a limitation to occasional exposure to overhead fluorescent lights to both of the ALJ's hypothetical individuals, and the VE responded that it would not have an impact on the jobs that he had testified about, but all jobs would be eliminated if the VE

-16-

added counsel's additional limitation that the hypothetical individuals would be off-task due to physical complaints of pain 15% of the workday or more. *Id*.

### III.     ALJ'S DECISION

In her February 25, 2016 decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. Tr. at 42. She further found that Plaintiff had worked after the alleged onset date of September 8, 2010, but she had not engaged in substantial gainful activity at that time. *Id*.

The ALJ found that Plaintiff had the severe impairments of bilateral plantar fasciitis (right worse than left), obesity, fibromyalgia, and cervical and lumbar spine disorders with radiculopathy in her upper extremities. Tr. at 43. She further found that these impairments, individually or in combination, did not meet or equal any of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *Id*. at 47-50. The ALJ thereafter determined that Plaintiff had the RFC to perform light work with the following limitations: she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk 4 hours of an 8-hour workday; sit for 6 hours of an 8-hour workday; she could frequently use right foot controls; she could never climb ladders, ropes, or scaffolds; she could frequently stoop and crouch; and she could never be exposed to hazards, such as unprotected heights. *Id*. at 50-51.

In her decision, the ALJ reviewed the medical opinions in the file and gave less weight to the agency examining doctor and agency reviewing physician's opinions, and she attributed significant weight to the opinions of the state agency psychological examiner and consultants. Tr. at 52-53. The ALJ also discounted Plaintiff's credibility, finding that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. *Id*. at 51.

Based upon the testimony of the VE and her RFC for Plaintiff, the ALJ determined that Plaintiff could perform her past relevant work as a pulmonary function technician. Tr. at 53. The ALJ therefore held that Plaintiff was not disabled under the Social Security Act from September 8, 2010 through the date of her decision. *Id*. at 53-54.

-17-

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to

social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward

with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon*

*v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and

makes a determination of disability.  This Court's review of such a determination is limited in scope

by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).  Therefore, this

Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v.*

*Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.     LAW AND ANALYSIS

### A.     Due Process and Equal Protection Violations

Plaintiff first asserts that her due process and equal protection rights were violated  when the Appeals Council failed to provide her notice of and reasons for denying her July 10, 2017 and August 10, 2017 requests for time extensions in which to submit additional evidence and argument concerning her request for review of the ALJ's decision. ECF Dkt. #16 at 1-3.  Plaintiff acknowledges that she received letters from the Appeals Council dated July 5, 2016, February 24, 2017, April 10, 2017, May 19, 2017, May 22, 2017, June 14, 2017, which granted her prior requests for additional time.  ECF Dkt. #16 at 1-2.  However, she contends that she filed two additional requests following her chemotherapy and a subsequent automobile accident, and she received no notice from the Appeals Council denying these extensions.  *Id.*  Plaintiff requests that this Court grant the time extension requests.  *Id.*

Defendant asserts that Plaintiff was provided with due process because the Appeals Council granted her six prior extensions in which to submit additional medical evidence and argument.  ECF Dkt. #18 at 12-13.  Defendant also contends that Plaintiff's counsel was provided with the relevant

exhibits and recordings on May 19, 2017 relating to Plaintiff's case and her counsel had everything necessary to submit argument on the request for review of the ALJ's decision at that time. *Id.* at 13-14. Defendant goes on to assert that Plaintiff lacked good cause for her subsequent requests for additional time on July 10, 2017 and August 10, 2017 because her counsel had all of the relevant documents to present argument and evidence concerning the request for review and the Social Security regulations contemplate circumstances where a claimant is seriously ill and unable, either herself or through others, to contact the Appeals Council and Plaintiff in this case was able to do so through her counsel and she did so. *Id.* at 14. Defendant also notes that the Appeals Council considered additional evidence that Plaintiff submitted when it ultimately denied her request for review. *Id.*

In her July 10, 2017 letter to the Appeals Council, Plaintiff's counsel reiterated the same reasons for an extension of time that she had stated in her June 12, 2017 fax, which were that she had spoken to an individual from the Appeals Council on May 19, 2017 and she had received a CD with Plaintiff's record on it, but she did not have sufficient time to review it. ECF Dkt. #1-1 at 1. She also repeated that Plaintiff had just completed chemotherapy at the end of June 2017, and Plaintiff was scheduled for another surgery in August of 2017. *Id.* Plaintiff's counsel requested additional time to respond to the ALJ's February 25, 2016 unfavorable decision. Compare ECF Dkt. #4 at 347 with ECF Dkt. #1-1 at 1. *Id.* Plaintiff made the same request for a time extension on August 10, 2017. *Id.*

The Appeals Council issued a Notice of Appeals Council Action dated July 31, 2017 denying Plaintiff's request for review of the ALJ's unfavorable decision. Tr. at 1. In that notice, the Appeals Council indicated that Plaintiff had "submitted reasons that you disagree with the decision" and it had considered the reasons and identified them as exhibits on its Order of the Appeals Council. *Id.* The Appeals Council noted Plaintiff's May 2, 2016 request for review and identified as exhibits Plaintiff's prior requests for extensions of time in which to file dated June 17, 2016, July 22, 2016, September 23, 2016, November 28, 2016, January 26, 2017, March 30, 2017, May 5, 2017 and June 12, 2017. *Id.* at 5-6.

-20-

The undersigned questions whether this Court has jurisdiction to determine whether Plaintiff's July 10, 2017 and August 10, 2017 requests for extensions of time constitute good cause which warranted granting extensions. *See e.g., Smith v. Comm'r of Soc. Sec*., 880 F.3d 813, 815-816 (6th Cir. 2018), *cert. granted* 139 S.Ct 475, (November 5, 2018)(Appeals Council decision to not consider claimant's request for review because it was untimely is not final decision subject to judicial review). Further, while the Appeals Council apparently did not issue notices to Plaintiff granting or denying these most recent requests for extensions of time, the undersigned questions the procedural aspect of considering this issue as well since the Appeals Council has already denied Plaintiff's request for review of the ALJ's decision.

In any event, considering the due process and equal protection aspects of Plaintiff's assertions, the undersigned recommends that the Court find that Plaintiff has failed to establish that she was entitled to notice by the Appeals Council of its action on her requests for extensions of time. While the Appeals Council granted Plaintiff's 6 prior extension requests which resulted in over an additional year of time, each of the letters that the Appeals Council sent to Plaintiff granting her prior time extensions provides that Plaintiff must send any additional information she wishes to submit within a specific number of days of the Appeals Council letter granting the extension of time. *Id*. at 9-22, 33-34. It further informs Plaintiff that it will not act for a specific number of days after granting the extensions. *Id*. The letter goes on to state that if the Appeals Council fails to hear from Plaintiff within that specific number of days, it is assumed that Plaintiff does not want to send in further information and the case will proceed. *Id.* at 10.

Thus, in its June 14, 2017 granting of Plaintiff's request for extension of time, the Appeals Council informed Plaintiff that she may submit additional evidence, and it would consider such evidence if it is new, material, related to the period on or before the date of the ALJ's decision, shows a reasonable probability that it would change the outcome of the decision, and she can show good cause as to why the evidence was not submitted earlier. *Id.* at 9. The Appeals Council letter also stated that the additional information or evidence must be submitted within 25 days of the date of the June 14, 2017 letter granting the extension of time. *Id*. at 10. It further informed Plaintiff that it would not act for 25 days after granting the extension. *Id*. The letter went on to state that if

-21-

the Appeals Council failed to hear from Plaintiff within 25 days, it would assume that Plaintiff did not want to send in further information and the case would proceed. *Id.* at 10. It further provided that "[w]e will not allow more time to send information except for very good reasons." *Id.* at 9.

Twenty-five days from the date of the June 14, 2017 letter was Sunday, July 8, 2017. Plaintiff's counsel faxed her letter requesting another extension on Monday, July 10, 2017. ECF Dkt. #1-1 at 1-2. The Appeals Council then issued its decision denying Plaintiff's request for review on July 31, 2017. Tr. at 5. There is no record indicating that the Appeals Council reviewed Plaintiff's July 10, 2017 or August 10, 2017 requests.

Regardless of whether the Appeals Council failed to rule on Plaintiff's time requests, Plaintiff fails to show that the Appeals Council was legally required to notify her of its action on either of them, one of which occurred well after the Appeals Council's denial of the request for review. Moreover, she fails to show prejudicial error resulting from the lack of notice since the additional information that Plaintiff offers in support of her arguments is either irrelevant to the time period covered by the ALJ's decision or lacking in support for a finding contrary to that of the Appeals Council.

Attached to her brief on the merits, Plaintiff offers Exhibits A-E in support her contention that had the Appeals Council had these Exhibits, it would have rendered a decision that she was disabled. ECF Dkt. #19 at 3-4. Exhibit A attached to Plaintiff's brief on the merits is an undated Form 3368 Disability Report Adult completed by Plaintiff in which she states that she stopped working on September 8, 2010 and she believes that her conditions were severe enough to keep her from working as of January 10, 2012. ECF Dkt. #16-1 at 2. Plaintiff makes an assertion of error as to the onset date in her merits brief. *Id.* at 3. However, in her applications for DIB and SSI, Plaintiff indicated that she became unable to work because of her disabling condition as of September 8, 2010. Tr. at 247, 251. The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 8, 2010. *Id.* at 42. In her brief on the merits, Plaintiff fails to explain how a later disability onset date impacts the Appeals Council decision denying her request for review or the ALJ's decision finding that she was not disabled for social security purposes from

September 8, 2010 through the date of the ALJ's decision.  Thus, the Court should find no merit to this assertion.

Plaintiff also attaches Exhibits B and C to her merits brief, which are journal articles concerning retinal nerve fiber layer thinning and its relation with visual field sensitivity and correlation to fibromyalgia.  ECF Dkt. #16-2, 16-3.  Again, however, Plaintiff presents no argument as to how these articles establish that due process was violated by a failure of notice by the Appeals Council as to her requests for extensions or how these articles establish error in the Appeals Council's ultimate decision denying her request for review.   The Court should find that these Exhibits do not aid Plaintiff's assertions of error as to due process and equal protection or show that they would have impacted the Appeals Council's determination to deny her request for review.

The undersigned recommends the same with regard to Plaintiff's Exhibits D and E, which are affidavits of Plaintiff and her sister, respectively.  ECF Dkt. #16-4, 16-5.  Plaintiff presents no reason why she did not present these affidavits prior to her ALJ hearing and Appeals Council request for review and these affidavits concerning Plaintiff's pain and limitations from her conditions considered by the ALJ and her new breast cancer diagnosis would not change the findings of the Appeals Council or the ALJ.

Accordingly, for the above reasons, the undersigned recommends that the Court find no merit to Plaintiff's assertion that she was denied due process based upon a lack of notice by the Appeals Council concerning her July 10, 2017 and August 10, 2017 requests for extensions of time.  In addition, the undersigned recommends that the Court find that Plaintiff provides no argument or analysis or support for an equal protection violation.

**B.**     **Disability Onset Date**

Plaintiff also asserts that the ALJ erred in determining her disability onset date.  ECF Dkt. #16 at 3.  She contends that her onset date is January 10, 2012 and not September 8, 2010, as the ALJ determined in her decision.  The undersigned recommends that the Court find no merit to this assertion.

Plaintiff provides only one sentence pertaining to this assertion of error.  ECF Dkt. #16 at 3.  She cites to and attaches Exhibit A to her merits brief, which is an undated, unsigned SSA Form

3386-BK Disability Report not found in the record.  On this form, Plaintiff indicated that she stopped working on September 8, 2010, but she circled the option that it was because she was laid off, and she indicated that her conditions became severe enough to keep her from working as of January 10, 2012. ECF Dkt. #16-1 at 1-2.

Substantial evidence in the record supports the ALJ's determination of the September 8, 2010 onset of disability date.  Plaintiff testified at her hearing, with counsel, that her onset date of disability was September 8, 2010.  Tr. at 75-76.  Neither Plaintiff nor her counsel moved to adjust this date at the hearing.  *Id.*  Plaintiff also indicated on her applications for DIB and SSI that September 8, 2010 was her disability onset date.  *Id.* at 247, 251.  Both of these applications specifically indicate September 8, 2010 as the date that Plaintiff put down as the date when she "became unable to work because of my disabling condition" and as when her "disability began." *Id.*  Further, in the disability report dated January 14, 2014 which Plaintiff's counsel completed, it was indicated that Plaintiff stopped working on September 8, 2010 "because of my condition(s). Because of other reasons," and she explained that there was not enough work.  *Id.* at 281. Nevertheless, when the form asked, "[e]ven though you stopped working for other reasons, when do you believe your condition[s] became severe enough to keep you from working? (month/day/year)," September 8, 2010 was the date that was used.  *Id.*

Since substantial evidence supports the ALJ's onset date of disability, Plaintiff did not raise this new onset disability date earlier, and Plaintiff shows no prejudice resulting from the ALJ's use of September 8, 2010 as the onset of disability date, the undersigned recommends that the Court find no merit to Plaintiff's assertion of a new disability onset date.

### C.    Plaintiff's Step 3 Assertions

The undersigned notes that Plaintiff makes a host of assertions under this Step.  First, she contends that the "ALJ determined that Ms. Allen's medical conditions did not reach the level of severity required for a Listing, including S[ocial] S[ecurity] R[uling] ("SSR") 12-2p for fibromyalgia." ECF Dkt. #16 at 3.  Plaintiff reviews the medical evidence establishing her diagnosis of fibromyalgia and she asserts that the ALJ failed to consider her optical records from the Cleveland Eye Clinic, her blood tests from Marymount Medical Center, and the diagnoses of her

-24-

fibromyalgia from both Dr. Mackey-Sawyer and Dr. Kocka of Brecksville Physical Medicine.  *Id.* at 3-10.  Plaintiff also cites to the treating physician rule and indicates that the ALJ must give controlling weight to the opinions of her treating physicians.  *Id.*  She further contends that the ALJ failed to apply SSR 12-2p to her condition, which was established by the medical evidence.  *Id.* at 11.

SSR 12-2p, entitled "Evaluation of Fibromyalgia," specifically states that "FM [fibromyalgia] cannot meet a listing in appendix 1 because FM is not a listed impairment."  SSR 12-2p.  Accordingly, to the extent that Plaintiff asserts that SSR 12-2p constitutes a Listing, she is incorrect.  SSR 12-2p explains that it provides guidance on the agency's policies "for developing evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM).  SSR 12-2p also explains how we evaluate FM in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act."  Thus, SSR 12-2p is not a Listing, but rather, is a policy explaining how a claimant establishes and when the SSA determines that a person has an MDI of FM.  SSR 12-2p.  SSR 12-2p further explains how the SSA considers FM in each step of the 5-step sequential evaluation process, indicating that at Step 1, if a person with FM is performing substantial gainful activity, he or she will be found not to be disabled.  *Id.*  The Ruling goes on to state that at Step 2, the severity of FM will be considered by evaluating whether it is reasonably expected to produce the pain or other symptoms that the claimant alleges, and whether the pain or other symptoms cause limitations that have more than a minimal effect on the ability to perform work activities.  *Id.*  In explaining how the SSA considers FM at Step 3, SSR 12-2p specifically states that "FM cannot meet a listing in appendix 1 because FM is not a listed impairment.  At step three, therefore, we determine whether FM medically equals a listing (for example, 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment."  SSR 12-2p.  At Step 4, SSR 12-2p explains that in determining RFC at this Step, all relevant evidence in the record is considered and a longitudinal record is considered whenever possible in cases of FM because FM symptoms can wax and wane.  *Id.*  Finally, as to Steps 4 and 5, SSR 12-2p provides that the widespread pain and other symptoms of FM, such as fatigue, can result in limitations that prevent

a claimant from performing a full range of unskilled work or they may have nonexertional limitations because of pain or other symptoms. *Id.* Finally, SSR 12-2p advises that, "[a]djudicators must be alert to the possibility that there may be exertional or nonexertional (for example, postural or environmental) limitations that erode a person's occupational base sufficient to preclude the use of a rule in appendix 2 to direct a decision. In such cases, adjudicators must use the rules in appendix 2 as a framework for decision-making and may consult a vocational resource." *Id.*

Much of the medical evidence cited by Plaintiff in her brief establishes her diagnosis of fibromyalgia, as well as her diagnoses of Hashimoto's hypothyroidism, stable mild stage glaucoma, migraines, bilateral plantar fasciitis, and degenerative spine conditions. ECF Dkt. #16 at 3-11. However, diagnoses alone, including that of fibromyalgia, do not establish a disability finding or an entitlement to social security benefits. *Stankoski v. Astrue*, 532 Fed. App'x 614 (6th Cir. 2013). Moreover, the ALJ in the instant case specifically considered Plaintiff's fibromyalgia at Step 2 and found it to be a medically determinable severe impairment. Tr. at 43. The ALJ also found at Step 2 that Plaintiff's bilateral plantar fasciitis, obesity, cervical and lumbar spine disorders with radiculopathy were severe impairments as well. *Id.* at 43-45. The ALJ also reviewed Plaintiff's glaucoma, hypothyroidism, migraines, asthma, positional vertigo, short-term memory and concentration issues, GERD, depression and anxiety and found them nonsevere at Step 2. *Id.* The ALJ thoroughly explained why she found those impairments nonsevere. *Id.*

The ALJ also presented a thorough review of Plaintiff's fibromyalgia at Step 3 of the sequential analysis, explaining why this impairment, in combination with Plaintiff's other impairments of obesity, bilateral plantar fasciitis, and degenerative spine disorders, did not meet or medically equal a Listing. Tr. at 47-50. The ALJ specifically reviewed Listing 1.02, Major Dysfunction of a Joint(s)(due to any cause), Listing 1.04 Disorders of the Spine, and she specifically reviewed SSR 12-2p in detail concerning fibromyalgia and its criteria. *Id.* She found that while Plaintiff had medically determinable impairments that were severe, Plaintiff's impairments, including her fibromyalgia, did not separately or in combination, meet or equal the severity of a listed impairment. *Id.* at 47. She noted Plaintiff's 40-year history of symptoms from cervical and lumbar degenerative disease, her 2002 diagnosis of fibromyalgia, and her complaints of back, neck,

shoulders and leg pain. *Id*. at 47, 453.  The ALJ also considered the objective medical evidence concerning Plaintiff's cervical and lumbar spine degenerative diseases, her obesity, and her plantar fasciitis, as well as the clinical findings relating to Plaintiff's fibromyalgia. *Id.* at 48-49.

In finding that none of the listings were met or medically equaled, the ALJ noted the mild to moderate objective findings as to Plaintiff's cervical and lumbar spine degenerative diseases, and she noted that Dr. Darr, the agency examining physician, found that Plaintiff ambulated with a normal gait, was not unsteady, did not require a hand-held assistive device, and had normal straight leg-raising. Tr. at 48-50.  The ALJ further found that Plaintiff was on medications, had undergone injections, and went to physical therapy after a six-year hiatus, which seemed to help her symptoms. *Id.* The ALJ also noted Plaintiff's activities, which included skiing in January of 2014, shoveling her driveway, teaching pottery classes, and knitting scarves for herself and charitable organizations, did not support a finding that the functional effects of Plaintiff's physical impairments, including her obesity and fibromyalgia, separately and in combination, rendered her totally disabled. *Id*. at 51-52, citing 349, 351, 353-357, 398, 440, 619-627, 652, 675, 677, 684, 687, 734, 751, 754, 767, 772.

Plaintiff cites to the treating physician rule and emphasizes that the Sixth Circuit has held that a treating physician's opinion is entitled to controlling weight.  ECF Dkt. #16 at 3, citing *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 377 (6ᵗʰ Cir. 2013).  However, Plaintiff fails to identify to the Court the treating physician opinion or opinions that she is referring to as not given such weight by the ALJ. ECF Dkt. #16 at 3.  Rather, she states that Dr. Mackey Sawyer and Dr. Kocka from Brecksville Physical Medicine diagnosed her with fibromyalgia. *Id.*  The ALJ accepted this diagnosis and found that it was a severe impairment.  Tr. at 43.  The ALJ also reviewed the diagnosis in combination with Plaintiff's other impairments and found that it did not meet or equal a listed impairment. *Id*. at 47-50.  The ALJ then determined a RFC which included restrictions on Plaintiff's abilities based upon her fibromyalgia and cervical and lumbar complaints. *Id.* at 50-51. Without more information by Plaintiff concerning the errors alleged made by the ALJ concerning the opinions or records of treating physicians, the undersigned recommends that the Court find no merit to this assertion.

-27-

In summary, the undersigned recommends that the Court find that the ALJ applied the correct legal standards concerning Plaintiff's impairments, including her fibromyalgia, and substantial evidence supports the ALJ's Step 3 finding that Plaintiff's fibromyalgia and other impairments, separately and in combination, did not meet or equal a listed impairment.

### D.   Credibility

Plaintiff also challenges the ALJ's credibility determination, asserting that the ALJ failed to consider the objective medical source opinions and other evidence supporting her report of the intensity, persistence and severity of her medical conditions.  ECF Dkt. #16 at 11-12.  Plaintiff cites to medical records and reports establishing her diagnoses, confirming her receipt of treatment, and documenting her complaints of pain and limitations from her medical conditions.  *Id.* at 4-11.

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529, SSR 96–7p[3].  In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

---

[3] Effective March 28, 2016, SSR 16-3p superceded SSR 96-7p.  *See* SSR 16-3p.  SSR 16-3p eliminates the use of the term "credibility" in order to "clarify that subjective symptom evaluation is not an examination of an individual's character.  SSR 16-3p.  Thus, adjudicators must consider all evidence in a claimant's record in evaluating the intensity and persistence of symptoms in order to determine how the symptoms limit an individual's ability to perform work-related activities.  *Id.*  SSR 16-3p emphasizes that in evaluating a claimant's symptoms, the focus is not to determine whether he or she is a truthful person. *Id.*  The ALJ's decision in this case predates the effective date of SSR 16-3p.

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. *See* SSR 96–7p, 61 Fed.Reg. 34483, 34484–34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey v. Sec'y of Health & Hum. Servs.,* 987 F.2d at 1230, 1234 (6th Cir. 1993). Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir.1997).

In the instant case, the ALJ cited to the proper social security regulations and rulings in evaluating Plaintiff's credibility.  Tr. at 51.  She determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible.  *Id*.  The ALJ cited to the opinion evidence from the state agency examining and reviewing physicians and found that Plaintiff was actually more restricted than that opined by these physicians.  *Id*. at 52-53.  The ALJ also cited to the longitudinal evidence from Dr. Mackey Sawyer and Plaintiff's physical therapy providers and found that they supported a finding that Plaintiff's fibromyalgia and cervical and lumbar conditions partially established her credibility concerning her complaints of pain and work-related restrictions.  *Id*. at 51.  The ALJ explained that the record showed that Plaintiff had some relief from physical therapy, injections and medications, and treatment notes showed that Plaintiff required no use of an assistive device or that she could perform the restricted RFC that the ALJ determined for Plaintiff.  *Id*. at 51-52.  The ALJ noted that Plaintiff testified that she was able to knit a scarf in one week in a total time of three hours, she

-29-

performed household chores, she taught pottery classes part-time, and she was able to knit scarves for herself and for charities.  *Id*. at 52.

Reviewing the ALJ's credibility determination, and affording great deference to the ALJ's credibility finding, the undersigned finds that the ALJ applied the proper legal standards in this case and substantial evidence supports her decision to partially discount Plaintiff's credibility.

**E.      RFC**

Plaintiff also contends that the ALJ erred in the RFC that she determined for Plaintiff.  ECF Dkt. #16 at 12.  She argues that the ALJ's limitation of Plaintiff to standing/walking no more than 4 hours of an 8-hour workday takes her out of the light duty work level and into the sedentary level work.  ECF Dkt. #16 at 12.  Plaintiff further asserts that nothing in the record supports the ALJ's finding that she could stand/walk for even 3 hours and all of the evidence indicated that she could not.  *Id*. at 15.  Plaintiff cites to medical records indicating that she could not walk even for 1 hour and walking aggravated her symptoms.  *Id*. at 12-15.

A claimant's RFC is an assessment of the most that a claimant "can still do despite [her] limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3).  The claimant bears the responsibility of providing the evidence used to make a RFC finding.  20 C.F.R. §§ 416.945(a)(3).  However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); Poe v. Comm'r of Soc. Sec., 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.  Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases.  SSR 96-8p.  The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis.  *Id*.  Further, it states that the RFC assessment must be based on all of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations.  *Id.*

-30-

In determining Plaintiff's ability to stand/walk in the instant case, the ALJ considered both the severe and nonsevere impairments of Plaintiff in determining her RFC. The ALJ explained that she considered Plaintiff's obesity and complaints of pain and limitations relating thereto, and she partially discounted Plaintiff's assertions of disabling pain due to her reports of activities inconsistent with severe pain and limitations. Tr. at 51-53. The ALJ reviewed Plaintiff's testimony and reports to her doctors that she had some relief from medication, physical therapy and injections, and she could care for herself, perform household activities, teach part-time pottery classes, knit scarves for charities, and she had shoveled her driveway and went skiing. *Id.* at 51-53. The ALJ also reviewed the opinion evidence of record, finding that the treatment notes of Plaintiff's treating physician, Dr. Mackey Sawyer, and the physical therapy notes, supported Plaintiff's credibility to the extent of the RFC that she had opined for Plaintiff. Tr. at 51. Dr. Mackey Sawyer did not offer an opinion as to Plaintiff's ability to walk/stand and the ALJ noted that her treatment notes did not establish any abnormalities that would impose greater exertional or nonexertional limitations than those determined by the ALJ. *Id.* at 51-52. The ALJ also reviewed the physical therapy records and determined work-related restrictions for Plaintiff's plantar fasciitis and lumbar pain with radiation by limiting her to frequent pedaling with the right foot only, standing/walking for up to 4 hours per 8-hour day, and restrictions from environmental hazards. *Id.* at 52. The ALJ also attributed less weight to the opinion of agency examining physician Dr. Darr, who opined no restrictions on Plaintiff's abilities to stand or walk, and to the findings of the agency reviewing physicians, who had opined that Plaintiff could stand and/or walk more than 6 hours in an 8-hour workday. *Id.* at 52-53, 124, 137, 151, 164, 454-457. The ALJ found that physical therapy records and an EMG required more restrictive physical limitations than those found by the agency physicians. *Id.* Thus, the medical evidence and Plaintiff's report of her activities did not support Plaintiff's assertion of a more restrictive standing/walking limitation.

For these reasons, the undersigned recommends that the Court find that the ALJ properly based her RFC on all of the relevant evidence in the record and substantial evidence supports her RFC determination, which included a 4-hour standing/walking limitation.

### F.      STEP 4 PAST RELEVANT WORK

Plaintiff further submits that the ALJ erroneously found that she could perform her past relevant work as a pulmonary function technician, both as she performed it and as it is performed in the national economy.  ECF Dkt. #16 at 15-16.  Plaintiff contends that as she performed this work, it was light work, which she could not perform because her standing/walking limitation was less than 6 hours.  *Id*.  She also submits that she could not perform her past pulmonary function technician job as she performed it because she worked 12-hour shifts which would require walking and standing up to 6 hours per workday and she could not do so now, and she could not use computers or LED-lit equipment due to her vision impairments.  *Id*. at 16-24.

At step 4, it is the claimant's "burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work" either as she previously performed it or as it is generally required in the national economy. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The Court should find no merit to Plaintiff's assertion that she cannot perform her past relevant work as she performed it because when the ALJ asked Plaintiff at the hearing to report the time of her day as a pulmonary function technician that she spent sitting, standing and walking, Plaintiff testified that about 85% - 90% of the time, she was sitting.  Tr. at 77.  She testified that "sitting down was definitely most of it."  *Id*. This belies her argument that she would have to have the ability to walk/stand for 6 hours per day in order to perform her past relevant work as a pulmonary function technician as she previously performed it.

The Court should also reject Plaintiff's assertion that she cannot perform her past pulmonary function technician job because of her vision impairments.  The ALJ addressed Plaintiff's vision impairments, finding that they were not severe impairments at Step 2 of the sequential evaluation as medical records showed that Plaintiff's glaucoma was stable with prescribed eye drops and her doctor did not recommend treatment for her nuclear sclerosis cataract other than monitoring it.  Tr. at 43, citing Tr. at 476, 488, 492, 496.  Plaintiff indicated that her glaucoma medications were

helpful in April of 2014 and when she began complaining of problems looking at a computer screen, her doctor found no abnormalities in May 2014 that required medical interventions. *Id*. at 474-476. Plaintiff also reported in January of 2016 that her eye symptoms were controlled by medications and eye examinations were normal. *Id*. at 91-92, 454-455, 521.

As to performing past relevant work as a pulmonary function technician as it is generally performed, the ALJ presented a proper hypothetical person to the VE and the VE found that such as person could perform the pulmonary function technician job as it is generally performed in the economy. Tr. at 108-110. Plaintiff's counsel did not modify the ALJ's hypothetical individual to include any restrictions relating to Plaintiff's inability to work with LED-light computers at the hearing. *Id*. at 110. Rather, the only vision-related restriction that Plaintiff's counsel added to the ALJ's hypothetical individual was to have only occasional exposure to overhead fluorescent lights. *Id*. at 111. The VE responded that even with this additional restriction, the hypothetical individual could still perform the pulmonary function technician position as it is generally performed in the national economy. *Id*.

Nevertheless, the ALJ determined in her decision that Plaintiff had no LED light vision impairment or restriction in her decision and substantial evidence supports her determination that Plaintiff's vision impairments were not severe since medical records showed stability with her glaucoma, no intervention for her nuclear sclerosis cataract, and no abnormalities concerning her vision and LED light.

## VI.   RECOMMENDATION AND CONCLUSION

For the above reasons, the undersigned recommends that the Court find no merit to Plaintiff's assertions and find that the ALJ applied the proper legal standard and substantial evidence

supports her decision.  Consequently, the undersigned recommends that the Court dismiss Plaintiff's complaint in its entirety with prejudice.

Date: January 28, 2019                    _/s/George J. Limbert_____
                                          GEORGE J. LIMBERT
                                          UNITED STATES MAGISTRATE JUDGE

     ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).